UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SE PROPERTY HOLDINGS, LLC | CIVIL ACTION |
| VERSUS | No. 14-mc-1739<br>c/w 14-2060 |
| UNIFIED RECOVERY GROUP,<br>LLC, ET AL. | SECTION: "J"(1) |

## ORDER AND REASONS

Before the Court are a *Motion for Summary Judgment* **(Rec. Doc. 106)** filed by SE Property Holdings, LLC ("SEPH"), and a *Motion for Summary Judgment* **(Rec. Doc. 110)** filed by the United States of America (the "IRS"). These are cross motions for summary judgment and, as is often the case, many of the arguments made therein are duplicative with the substance of the parties' opposition and reply briefs. Considering the cross motions, the memoranda, the record, and the law, the court finds that partial summary judgment should be granted in favor of SEPH.

## FACTS AND PROCEDURAL HISTORY

The central dispute in this case is whether SEPH's state law security interest or the IRS's tax lien has priority as to funds pertaining to certain accounts receivables that were generated from work performed in the aftermath of Hurricanes Katrina and Isaac. Following the devastation of Katrina, St. Bernard Parish entered into a contract with a group of joint-venturers to remove the debris left behind by the storm.[1] In September of 2005, the contract was assigned to Unified Recovery Group,

---

[1] (Rec. Doc. 106-3 at 3).

LLC ("URG"). The parish entered into a second, direct contract with URG in December of 2005 (collectively, the "Katrina Contract").[2] Then, after Hurricane Isaac struck, St. Bernard and URG entered into a third debris removal contract (the "Isaac Contract").[3] URG completed all the debris removal work under the contracts relevant to the disputed funds before December 31, 2012.[4]

On August 29, 2008, SEPH[5] and URG entered into three transactions.[6] First, URG executed a promissory note in favor of SEPH in the amount of $10,000,000. Second, URG executed a loan agreement ("Loan Agreement") that stated SEPH would provide revolving loans to URG, up to the $10,000,000 limit of the note. Third, URG executed a ("Security Agreement") in favor of SEPH, securing URG's repayment obligations and "any and all present and future indebtedness and obligations now or hereafter owing by the Borrowers."[7] The Security Agreement grants SEPH a security interest in, among other things, "all of [URG's] accounts of any kind . . . whether now existing or hereafter arising."[8] SEPH filed a corresponding financing statement into the UCC registry of Louisiana on August 29, 2008,[9] and SEPH has since filed routine continuation statements through August 1, 2018.[10]

---

[2] (Rec. Doc. 106-7 at 6-7).
[3] (Rec. Doc. 106-3 at 3).
[4] (Rec. Doc. 115-1 at 13-14).
[5] Technically, URG transacted with Vision Bank, but SEPH is Vision Bank's successor-in-interest due to a 2012 merger. The Court will follow the parties' practice of using "SEPH" to refer to both SEPH and Vision Bank.
[6] (Rec. Doc. 106-3 at 4).
[7] (Rec. Doc. 110-5 at 6).
[8] (Rec. Doc. 110-5 at 5).
[9] (Rec. Doc. 106-3 at 4-5).
[10] (Rec. Doc. 106-3 at 5).

On the same day these transactions were entered into, URG was reorganized. A new entity, JKS,[11] was formed to effectuate the buyout of two other URG members.[12] For this transaction, URG and JKS entered into a "Contribution Agreement" in which URG transferred its interest in "[a]ll accounts receivable of [URG] . . . billed on or before" August 29, 2008, to JKS.[13] However, SEPH asserts, and nothing in the record contradicts, that no document was ever filed in the public registry or record of any state giving notice of this transfer.[14]

In June of 2011, URG executed two more promissory notes in favor of SEPH, in principal amounts of $4,000,000 and $2,681,000.[15] Per its broad language, this additional indebtedness is also secured by the Security Agreement.

SEPH made its first advance to URG on September 2, 2008 and its last advance on February 24, 2012. URG did not pay back the loans and in 2013, SEPH obtained a money judgment against URG for more than $20,000,000.[16] Before that judgment issued, the IRS filed a notice of tax lien with the East Baton Rouge Clerk of Court claiming unpaid federal taxes with interest.[17]

In September of 2014, St. Bernard Parish filed a complaint as an interpleader so that the Court could determine who had priority as to FEMA funds that were

---

[11] Two related entities bearing the name JKS-URG have attempted to intervene in this case: JKS-URG, LLC and JKS-URG Management Co., LLC. The Court refers to these entities collectively as "JKS" for the sake of simplicity.

[12] (Rec. Doc. 106-3 at 5).

[13] (Rec. Doc. 106-10 at 2).

[14] (Rec. Doc. 106-3 at 5).

[15] (Rec. Doc. 106-3 at 5).

[16] *See SE Property Holdings, LLC v. Unified Recovery Group, LLC, et al.* No. 3:12-cv-231-JJB, 2013 WL 1385398 (M.D. La. April 3, 2013).

[17] (Rec. Doc. 110-1).

distributed to the parish so that the parish could pay for the debris removal work.[18] In total, the parish has deposited $610,081.45 of the FEMA funds into the Court's registry. The IRS intervened, and now claims it is entitled to $302,803.37 of these funds, per its liens, with interest from September 30, 2018 and till payment, with costs.[19] JKS attempted to intervene but Magistrate Judge Shushan denied the interventions.[20]

## PARTIES' ARGUMENTS

### I. SEPH'S MOTION FOR SUMMARY JUDGMENT.

SEPH argues its security interest in the funds attached and is perfected pursuant to Louisiana law.[21] URG authenticated the Security Agreement by signing it on August 29, 2008. SEPH gave value in the form of routine advances on the loan, beginning on September 2, 2008. Finally, URG had rights in the collateral because URG was a payment obligee pursuant to the Katrina Contract as of September 2, 2008 and an obligee pursuant to the Isaac Contract as of 2012.

SEPH acknowledges that URG transferred all rights to accounts receivable billed on or before August 29, 2008 to JKS. URG invoice [A](801574) for $457,115.01 was billed well before this date, on April 17, 2006.[22] Thus, it would appear that URG had no right to payment for work performed pursuant to invoice [A](801574) when URG granted the security interest in its accounts to SEPH. That is significant

---

[18] (Rec. Doc. 20).
[19] (Rec. Doc. 110-1 at 1).
[20] (Rec. Docs. 40, 52).
[21] (Rec. Doc. 106-3 at 9-12).
[22] (Rec. Doc. 115-1 at 13).

because $227,075.00^{23}$ of the disputed funds was distributed to St. Bernard to pay for work the performed pursuant to invoice [A](801574). Nevertheless, the sale of the accounts to JKS is inconsequential, says SEPH, because JKS never gave notice to the world that JKS had obtained ownership of URG's invoices. SEPH argues that, per the UCC—which Louisiana has adopted—because JKS never perfected its security interest as a buyer, SEPH's right to payment under invoice [A](801574) remains the same as if the pre-August 29, 2008 accounts had never been sold.[24]

Regarding its competing creditor, SEPH admits that the IRS has a lien that is effective from January 29, 2013—the date the IRS filed its Notice of Tax Lien.[25] However, SEPH maintains that its security interest attached and was perfected no later than September 2, 2008. Therefore, SEPH argues it is entitled to priority to the disputed funds according to the general "first in time, first in right rule." Moreover, SEPH avers that the result is not changed, even though the general rule is subject to the "choatness" doctrine.[26] That doctrine requires that property be "in existence" for a security interest to form. SEPH argues that its security interest became choate when URG completed all of the work in the URG invoices before the end of 2012.[27] Thus, SEPH's security interest came into existence in 2012 at the latest, and SEPH

---

[23] According to the IRS, the reason for the substantial difference in the amount due under the invoice, and the amount the parish deposited into the Court's registry is due to St. Bernard paying itself and other subcontractors before depositing the remainder. (Rec. Doc. 115-1 at 13 n. 27).

[24] (Rec. Doc. 106-3 at 11-12).

[25] (Rec. Doc. 106-3 at 13). By operation of the tax code, however, the effective priority date is somewhat later.

[26] (Rec. Doc. 106-3 at 14-17).

[27] (Rec. Doc. 106-3 at 16).

enjoys priority over the IRS's tax lien, which became effective against other creditors no earlier than January 29, 2013.[28]

## II. THE IRS'S MOTION FOR SUMMARY JUDGMENT

The IRS contends that whatever security interest SEPH has in the disputed funds is primed by the IRS's lien for the tax period ended June 30, through December 21, 2012, with interest.[29] That is because the Security Agreement begins its grant as follows:

> **Section 2.01. Grant of Security Interest**. [URG] hereby grants and confirms that it has granted to [SEPH] a security interest, subject only to Permitted Liens (as defined in the Agreement) in . . . all of [URG's] accounts of any kind whether now existing or hereafter arising.

(Rec. Doc. 110-5 at 5). The IRS argues that this excerpt has the effect of subjugating SEPH's security agreement in favor of the IRS's lien. The IRS's argument requires the Court to first find that the IRS's tax lien is a "Permitted Lien." Second, the Court must accept the IRS's argument that the effect of URG granting a security interest "subject only to" the IRS's lien, is that those words "limit[] SEPH's interest in the SBPG receivables to any amounts remaining after the payment of the IRS lien."[30]

Second, the IRS argues that it is the "law of the case" that the IRS lien is a Permitted Lien, because of the reasoning in Magistrate Judge Shushan's orders

---

[28] (Rec. Doc. 106-3 at 16).
[29] (Rec. Doc. 110 at 3).
[30] (Rec. Doc. 110-1 at 4).

denying JKS's attempted interventions.[31] In her order Judge Shushan adopted the IRS's reasoning that "the assignment of receivables was made subject to taxes not yet due and payable and there can be no distribution to JKS until the obligation to the United States is satisfied.[32]

Third, the IRS argues that SEPH's claim to funds arising from JKS's receivables fails because SEPH's internal documents indicate that SEPH is entitled to only one-third of any distribution of JKS's receivables.[33] These documents reflect that the other two-thirds belong to JKS's other member entities.

Finally, the IRS argues that the disputed funds are receivables of a "unique nature" because they are derived from contracts funded by FEMA.[34] The consequence of this, the IRS urges, is that priority must be given to the IRS's lien, rather than SEPH's security interest. The crux of the IRS's argument is that SEPH's security interest did not come into existence until URG earned a right to payment based on performance. The IRS argues that "performance" in this case does not just mean the work of picking up the debris but also providing adequate documentation to substantiate the work performed. According to the IRS, URG did not acquire a right to payment until the parish and FEMA found URG's documentation of its work acceptable. Thus, SEPH did not have a valid security interest in receivables until FEMA approved distribution of funds. FEMA approved reimbursements at various times, for example, FEMA approved $279,205 in funds for work performed under the

---

[31] (Rec. Doc. 110-1 at 6).
[32] (Rec. Doc. 52).
[33] (Rec. Doc. 110-1 at 8).
[34] (Rec. Doc. 110-1 at 9-14)

Isaac contract on June 25, 2016, well after the IRS lien attached. The IRS urges that the evidence shows—or SEPH has failed to provide contradictory evidence—that FEMA approved reimbursement for funds after the IRS's lien attached, and therefore the IRS is entitled to priority to recover the tax debt from the disputed funds.

## STANDARD OF LAW

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)), *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving

party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075.

When examining matters of state law, this Court will employ the principles of interpretation used by the state's highest court. *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 564 (5th Cir. 2010). Mindful of Louisiana's distinction between primary and secondary sources of law, the Court will begin its analyses with reliance on the Louisiana Constitution and statutes before looking to "jurisprudence, doctrine, conventional usages, and equity, [which] may guide the court in reaching a decision in the absence of legislation and custom." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 547 (5th Cir. 2004) (quoting La. Civ. Code. art. 1 rev. cmt. b). If the Court must make an "Erie guess" on an issue of Louisiana law, the Court will decide the issue the way that it believes the Supreme

Court of Louisiana would decide it. *Id.* (citation omitted). This Court is not strictly bound by the decisions of the state intermediate courts and will disregard them if the Court is "convinced that the Louisiana Supreme Court would decide otherwise." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007).

## **DISCUSSION**

This is a priority dispute. To resolve it, the Court must first determine "[t]he existence, nature and extent of [SEPH's] security interest," an inquiry in that is "governed by state law." *Butner v. United States*, 440 U.S. 48, 55 (1979). Here, that means applying the law of Louisiana. The IRS does not appear to dispute that SEPH has a perfected security interest in the majority of URG's accounts receivables and therefore the disputed funds. Instead the IRS's first contention is that the security agreement subjugates SEPH's security interest in favor of tax lien as a matter of contractual agreement.[35] If the Court resolves that question in favor of SEPH, the Court will need to address the IRS's alternative argument that federal tax lien law affords priority to the IRS because SEPH's security interest did not come into existence until after the IRS had given appropriate notice of its tax lien.

## I. WHETHER SEPH'S SECURITY INTEREST IS PRIMED BY THE IRS'S LIEN BY THE SECURITY AGREEMENT'S LANGUAGE

The IRS argues that as a matter of contract, the Security Agreement gives priority to the IRS's tax liens. As noted above, the Security Agreement between URG and SEPH is quite broad. Article II, which describes SEPH's security interest, states:

---

[35] (Rec. Doc. 110-1 at 3-8).

**Section 2.01. Grant of Security Interest.** [URG] hereby grants and confirms that it has granted to [SEPH] a security interest, subject only to Permitted Liens (as defined in the Agreement) in, a general lien upon, and a right of set-off against the following described property: (a) all of [URG's] accounts of any kind (including all leases) whether now existing or here after arising.[36]

Subsections (b) through (i) go on to list URG's general intangibles, equipment, inventory, instruments, commercial tort claims, deposit accounts, and proceeds, among other collateral types.[37] In other words, excepting real, non-movable property, the Security Agreement collateralizes SEPH's loans with just about every asset that URG had rights in or could come to have rights in. There is no contesting then that SEPH has a security interest in the disputed funds.[38] Whether considered either as accounts receivable or proceeds, the funds fall under the wide scope of the Security Agreement. The IRS maintains instead that a clause in the middle of the introductory sentence concedes SEPH's priority to the tax liens. The IRS argues the phrase, "subject to Permitted Liens (as defined in the Agreement)" requires the IRS to be paid ahead of SEPH, for the IRS's tax liens are "Permitted Liens."

To resolve the meaning of this phrase, the court must engage in contract interpretation according to the principles set for in articles 2045-2057 of the Louisiana Civil Code. The most basic being, "Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code Ann. art. 2045. If a contractual phrase is unambiguous and will not result in absurd consequences, the

---

[36] (Rec. Doc. 110-5 at 5).
[37] (Rec. Doc. 1105 at 5-6).
[38] With the notable exception of receivables billed before August 29, 2008. The Court addresses this wrinkle in Part III.

plain meaning controls. La. Civ. Code Ann. art. 2046. However, where "[w]ords are susceptible of different meanings" the Court must choose the "meaning that best conforms to the object of the contract." La. Civ. Code Ann. art. 2048.

In their briefing the parties largely ignore the phrase "subject only to" but the Court believes the meaning of these words is necessary to understand what follows. The meaning of "subject to" in a contract depends on context. *In re Babcock & Wilcox Co.*, No. CIV.A. 08-3608, 2008 WL 4809486, at *6 (E.D. La. Oct. 31, 2008) (recognizing "subject to" means "liable to" in one context and "contingent upon" in another). Here, the Court believes that "subject only to" means that SEPH's security interest may be subordinated only by certain liens specifically contemplated by the signatories. "In other words, the phrase is 'introducing a subordinate provision,' indicating that the proposition set forth before the phrase can be superseded by a contrary provision in [the provision referenced thereafter]." *Carson v. Home Owners Ins. Co.*, No. 308291, 2014 WL 1510039, at *3 (Mich. Ct. App. Apr. 15, 2014) (quoting GARNER'S DICTIONARY OF LEGAL USAGE 616 (3rd ed. 2011)). The phrase then, is an acknowledgement that "Permitted Liens," may exist and these permitted liens, and only they, *may* have priority over SEPH's Security Interest.[39]   To determine whether a Permitted Lien *does* subjugate the Security Agreement, the Court believes the proper course is to turn to the priority rules.

---

[39] For example, if a contract states, "Subject to section 7, the maximum expenditure will be $10,000" that provision suggests that the expenditure ceiling *might* be overridden by factors mentioned in section 7. *See* GARNER'S DICTIONARY OF LEGAL USAGE 616 (3rd ed. 2011).

The IRS interprets "subject only to" to itself concede SEPH's priority to all "Permitted Liens," regardless of what the priority rules say. This interpretation is at odds with the object of the signatories and is an unnatural reading of the Security Agreement. This is clear when the meaning of the second half of the clause— "Permitted Liens (as defined in the Agreement)"—is considered. Given the parenthetical, one would assume that all one must do to determine whether the IRS's tax lien is a "Permitted Lien" is look at the definitional section of the Security Agreement. But the Security Agreement does not actually define Permitted Liens. Which "Agreement" the signatories meant would define the Permitted Liens is not clear because the Security Agreement mostly, but not always, refers to itself as "Security Agreement."[40] Further confusing things, section 6.11 of the Security Agreement states, "If any provision contained in this Security Agreement is in direct conflict with, or inconsistent with, any provision of the Agreement, the provision in the Agreement shall govern and control." (Rec. Doc. 110-5 at 19). From this it would appear that "Agreement" must refer to some other agreement between the parties. The IRS suggests that the referenced "Agreement" is the Contribution Agreement which was attached to the Security Agreement and which does indeed self-define itself as "this Agreement."[41] However, that's another dead end; the Contribution Agreement does not define "Permitted Liens" either.[42]

---

[40] In section 5.04 the Security Agreement begins by referring to remedies granted in "this Security Agreement" but in the second paragraph drops "Secured" and uses the shorter, "this Agreement" in describing foreclosure proceedings. (Rec. Doc. 110-5 at 14-15).

[41] (Rec. Doc. 110-5 at 22).

[42] (Rec. Doc. 110-5 at 22-32).

The Loan Agreement though, signed on the same day as the Security Agreement, does define "Permitted Liens."[43] The IRS asks this Court to find "Permitted Liens" to be an ambiguous phrase and to determine the parties' intent by applying the Loan Agreement's definition pursuant to the exception allowing parol evidence.[44] In the Loan Agreement's article X, which describes certain negative covenants, section 10.4 states:

> **Encumbrances.** [URG] shall not create, incur, assume or permit to exist any Encumbrances on any of their properties now owned or hereafter acquired, except the following (hereinafter referred to as the "Permitted Encumbrances"):
>
> (a)     Encumbrances for taxes, assessments, or other governmental charges not yet due or which are being contested in good faith by appropriate action promptly initiated and diligently conducted, if such reserves as shall be required by GAAP shall have been made thereof.[45]

Subsections (b) through (e) also allow URG to encumber itself with liens pursuant to ERISA obligations and by all state and local taxing bodies and liens by carriers, warehousemen, mechanics, laborers, and materialmen.[46] Thus, the IRS argues that its lien, being for taxes not due, is a "Permitted Lien" that URG and SEPH intended that SEPH's security interest would be "subject to," which the IRS interprets to mean that its lien "must be paid before any of the interpleaded funds are distributed to SEPH."[47]

---

[43] (Rec. Doc. 110-4 at 23).
[44] (Rec. Doc. 110-1 at 4).
[45] (Rec. Doc. 110-4 at 23).
[46] (Rec. Doc. 110-4 at 23).
[47] (Rec. Doc. 110-1 at 5).

The Court cannot follow the IRS down this circuitous path to find an intent between the signatories of the Security Agreement that is so incongruous with the object of their contract. *See* La. Civ. Code Ann. art. 2048. As SEPH opines in its opposition, the IRS's position is that SEPH intended to—in its very broad security agreement—forfeit its priority not only to the IRS but also to landlords, vendors, carriers, laborers, and all the other permitted lien holders (the IRS's reading must be applied to subsections (a) through (e) if it is to make any sense). The purpose of the negative covenants article is to prevent the debtor, URG, from taking certain actions—such as taking on additional debt and liens—which could endanger repayment of SEPH's loans. However, as SEPH notes, the Loan Agreement must allow some liens that form by operation of law or URG could simply not operate as a business without breaching the Security Agreement. As an example, SEPH draws attention to a provision in the Loan Agreement which permits a mechanic's lien. This type of lien would form by operation of La. Stat. Ann. § 9:4501 any time URG had one of its trucks repaired in a mechanic's garage. The Court reads the Loan Agreement to permit this lien to form without putting URG in breach for conducting its business in an ordinary manner. The Court reads the Security Agreement to merely acknowledge that certain liens, such as mechanic's liens, may have been allowed to form.

So it is with the section 10.4(a) of the Security agreement, which allows for liens for taxes "not yet due." The Court agrees with SEPH that 10.4(a) should be read *in pari materia* with the Loan Agreement's section 9.5, requiring URG to pay taxes

as they become due.[48] Considering the Loan Agreement as a whole then, the Court is persuaded that section 10.4(a) permits an interim lien and but does not suggest an intent by the signatories that the IRS's lien would prime SEPH's security interest in a priority dispute. The IRS counters that it was URG and SEPH's intent to subjugate SEPH's security interest because, "Had URG become delinquent in paying its employment taxes, the chances of it obtaining an award of any additional contracts would be severely diminished, and its ability to pay off the SEPH loans highly unlikely."[49] This may be true but it does not explain why in such a scenario where URG's ability to repay was compromised, SEPH would have intended to forfeit its security interest. Indeed, the whole object of the parties' Security Agreement is to allow SEPH to make claims on collateral in the event that repayment is jeopardized. On the other hand, if SEPH felt it was in its best interest to restructure the loan to allow URG to pay off tax debts, nothing would have prevented URG and SEPH from entering into a new contract doing just that. The Court must turn to the priority rules to determine who must be paid first.

## II.    APPLICATION OF THE LAW OF THE CASE DOCTRINE

Before the Court can apply the applicable priority rules, the Court must briefly address the IRS's argument that this Court is somehow prevented from ruling anyway other than in the IRS's favor because of Magistrate Judge Shushan's decision regarding the intervention of JKS. The IRS's assertion that this Court is "bound by its prior decisions" overstates the force of the law of the case doctrine in the Fifth

---

[48] (Rec. Doc. 110-4 at 20).
[49] (Rec. Doc. 127 at 2).

Circuit. While res judicata binds a court, "the law of the case doctrine is merely a '*rule of practice*, based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter.'" *Loumar, Inc. v. Smith*, 698 F.2d 759, 762 (5th Cir. 1983) (quoting *United States v. United States Smelting Refining & Mining Co.*, 339 U.S. 186, 198 (1950)). Regardless, this is the first time the issue of priority as between SEPH and the IRS has been presented squarely before the Court with the benefit of adequate briefing from the relevant parties. In her orders, Judge Shushan adopted the IRS's reasoning after JKS failed to file any reply countering the IRS's arguments.[50] SEPH did not file anything related to JKS's intervention because SEPH did not oppose intervention.[51] The Court does not find the doctrine applicable in these circumstances but to the extent the "law of the case" contradicts with this Order, it is overruled.

### III. WHETHER URG POSSESSED SUFFICIENT RIGHTS IN URG INVOICE [A](801574) SUFFICIENT TO ALLOW URG TO GRANT A SECURITY INTEREST

SEPH does not dispute that on August 29, 2008, URG transferred its interest in "all accounts receivable . . . billed on or before" August 29, 2008 to JKS.[52] This means that URG transferred its interest in URG invoice [A](801574)—billed on April 17, 2016—before SEPH and URG entered into the Security Agreement. From this it follows that URG, as debtor, did not have "rights in the collateral or the power to transfer rights in the collateral to a secured party"—and that SEPH's security

---

[50] (Rec. Doc. 52 at 3-4).
[51] (Rec. Doc. 114 at 7).
[52] (Rec. Doc. 106-3).

interest never attached to this account receivable. *See* La. Rev. Stat. § 10:9-203(b)(2). Thus, barring application of some exception to the general rule, SEPH does not have a security interest in a significant portion of the disputed funds—$227,075.00— deposited to pay invoice [A](801574).

There is just such an exception, codified in Louisiana Revised Statute § 10:9-318. According to the UCC, as adopted in Louisiana, a debtor who sells an account "does not retain an ownership interest in the collateral sold." La. Stat. Ann. § 10:9-318(a). Nevertheless, with regard to creditors' rights, where "a debtor has sold an account or chattel paper, while the buyer's interest is unperfected, the debtor is deemed to have rights and title to the account or chattel paper identical to those the debtor sold." La. Stat. Ann. § 10:9-318(b). Thus, "[a]s a consequence of subsection (b), if [JKS's] security interest is unperfected, [URG] can transfer, and [SEPH] can reach, the account or chattel paper as if it had not been sold." UCC § 9-318 cmt. 3. SEPH has put forth evidence reflecting that it accomplished the last step necessary for attachment and perfection on September 2, 2008.[53] There is no evidence in the record suggesting that JKS ever filed a financing statement. Therefore, it appears that SEPH has priority as to the $227,075.00. However, now that the Court has determined that any dispute to these funds is between SEPH and JKS, the Court agrees with the IRS that "all persons having an interest in those funds are not before

---

[53] SEPH gave value on this day by allowing URG to draw on its $10 million line of credit. (Rec. Doc. 106-4 at 94).

the Court for the matter to be fully and fairly adjudicated."[54] The Court will allow JKS to intervene to argue its entitlement to that portion of the disputed funds.

## IV. APPLICATION OF THE PRIORITY RULES

Finally, the Court comes to application of the appropriate priority rules. While the existence and precise nature of an interest is determined according to state law, the issue of priority between conflicting interests is settled according to federal law. *Aquilino v. United States*, 363 U.S. 509, 513-14 (1960). The dispute in this case is between a perfected state security interest and a federal tax lien. It's something of a custom for weary courts to begin their analyses of such a dispute by acknowledging that the court stands at intersection of the "tortured meanderings of federal tax lien law" and the "somewhat smoother byway of the Uniform Commercial Code." *Texas Oil & Gas Corp. v. United States*, 466 F.2d 1040, 1043 (5th Cir. 1972).

When a person neglects to pay taxes a lien forms in "favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." 26 U.S.C. § 6321. "Federal tax liens do not automatically have priority over all other liens." *United States v. McDermott*, 507 U.S. 447, 449 (1993) "Absent provision to the contrary, priority for the purposes of federal law is governed by the common-law principle that 'the first in time is the first in right.'" *Id.* (quoting *United States v. New Britain*, 347 U.S. 81, 85 (1954)). The tax lien becomes valid against competing security interests when it is filed with the clerk of the district court in the jurisdiction where the subject property is located. 26 U.S.C. § 6322(f)(1)(B). In

---

[54] (Rec. Doc. 110-1 at 8).

contrast, a state lien is held "to be in existence for 'first in time' purposes only when it has been 'perfected' in the sense that 'the identity of the lienor, *the property subject to the lien*, and the amount of the lien are established.'" *McDermott*, 507 U.S. at 449 (quoting *New Britain*, 347 U.S. at 84); *see also* 26 U.S.C. § 6323(h)(1). In other words, for a state lien to be first in time it must be "choate" but a federal tax lien comes into existence upon appropriate notice, regardless of whether it has attached to identifiable property. *Id.* at 453. The IRS did not file notice of a tax lien until January 29, 2013, but the date priority turns on is March 16, 2013, the 46th day after notice of the tax lien was filed.[55] If SEPH's security interest in the receivables came into existence before that date, then SEPH is entitled to summary judgment.

The parties seemingly agree that the property at issue is best described as accounts receivable.[56] According to the IRS's regulations, an account receivable "is in existence when, and to the extent, a right to payment is earned by performance." 26 C.F.R. § 301.6323(h)-1. The IRS admits that the "debris removal work" was completed

---

[55] A state lien in qualified property, including "commercial financing security"—which includes accounts receivables—is afforded a 45-day grace period extending from the IRS's notice filing in which to attach. *See* 26 U.S.C. § 6323, 26 C.F.R. § 301.6323(c)-1; *see also Bremen Bank & Tr. Co. v. United States*, 131 F.3d 1259, 1263 (8th Cir. 1997).

[56] There is a fair argument to be made that the property at issue here is actually the proceeds of contract rights. *See generally Bremen Bank*, 131 F.3d at 1261 (determining that bank's property interest was partly in proceeds of contract rights and partly in accounts receivable and that this distinction determined priority dispute with the IRS). "A contract right is any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper." 26 C.F.R. § 301.6323(c)-1. A contract right comes into existence "when the contract is made." *Id.* "Identifiable proceeds, which arise from the collection or disposition of qualified property by the taxpayer, are considered to be acquired at the time such qualified property is acquired if the secured party has a continuously perfected security interest in the proceeds under local law." *Id.* URG granted SEPH a security interest in "all rights now or hereafter existing in . . . contracts . . . relating to any Accounts" and all proceeds thereof. (Rec. Doc. 110-5 at 5-6). However, the issue has not been properly briefed and so the Court will not address it in this Order.

no later than the end of 2012—before the IRS filed its tax lien—but argues that URG did not achieve "performance" until much later.[57] The IRS takes the position that providing documentation demonstrating that the work URG performed was eligible and that costs were reasonable was part of the "debris removal activities required under the contract."[58] The IRS offers up the date that FEMA approved reimbursements, June 25, 2016, as the date performance was achieved and SEPH's interest became choate.

The IRS's argument is clever. A lien becomes choate "when the work giving rise to the account receivable is performed . . . even if the money itself has not yet been paid." *Mecco, Inc. v. Capital Hardware Supply, Inc.*, 486 F. Supp. 2d 537, 543 (D. Md. 2007). The IRS does not attack this proposition head on but attempts a dodge by urging that URG providing proof of its work was itself part of the work to be done. This definition of URG's required performance appears to be supported by language in the Isaac Contract but not the Katrina Contract.[59] The Katrina Contract appears to define performance simply and with no mention of any documentation to be provided by URG: "The services to be provided by Contractor for the Owner include those which are necessary for the removal of excess green waste and/or bulk refuse from . . . public sites."[60] In contrast, the Isaac Contract, in a section titled, "Scope of Work & Services, & Required Documentation of Work" required URG to pick up the

---

[57] (Rec. Doc. 115-1 at 13-14).
[58] (Rec. Doc. 110-1 at 12).
[59] At certain points in its briefing, the IRS has chosen to cite not to specific passages of contracts or depositions but instead refers the Court to entire exhibits or large swaths of deposition testimony to support its arguments.
[60] (Rec. Docs. 110-4 at 7, 106-7 at 6-7).

debris and also document debris removal with load tickets and hanger counts, review this documentation for compliance with FEMA regulations, and "[a]ssist in preparation of documentation for claims submitted for reimbursement of Contractor's activities under this agreement."[61] Thus, there is a colorable argument that URG did not acquire a "right to payment" from the parish under the Isaac Contract until after URG had provided adequate documentation to the parish evidencing URG had actually picked up the debris. This interpretation of URG's required performance is supported by St. Bernard's deposition testimony, given through the parish's representative, Jeffrey Bonura,[62] who testified that URG had completed its work once he reviewed an invoice and a backup from URG, and approved of the invoice.[63] Thus, the Court finds that in order to achieve performance under the Isaac Contract, URG was required to provide documentation. The question remains though, at what point did URG provide sufficient documentation to achieve performance?

The IRS, working from the premise that "URG did not acquire the right to payment earned by performance until it complied with the documentation requirements" suggests that "the best measurement of when" URG provided adequate documentation to the parish "is approval of the FEMA reimbursements." (Rec. Doc. 127 at 9). The Court is flummoxed at how the IRS arrives at the date *FEMA*

---

[61] (Rec. Doc. 110-4 at 47-48).

[62] Mr. Bonura and his firm were hired by the parish to review invoices, modify them as necessary, and make recommendations on the work to be completed. The Department of Public Works, while nominally responsibly for approving invoices, "basically, approved of what Mr. Bonura said, because we hired him to monitor that; and to rectify those invoices." (Rec. Doc. 127-5 at 26).

[63] The exchange with SEPH's counsel and the Mr. Bonura was as follows: "Would it be fair to say that, once you had reviewed an invoice, and backup from URG, and approved that invoice, you had made a determination that the contractor had completed the work in accordance with the contract terms?" "That is what my letters would say; yes."

decided to act as indicating the date *URG* performed. FEMA was not a party to either of the Contracts and there is no provision conditioning the parish's payment to URG upon approval of reimbursement by FEMA. Such a condition was apparent in *Coastal Dev. Grp., L.L.C. v. Int'l Equip. Distributors, Inc.*, 2011 WL 766608 (La. App. 1 Cir. 2/11/11), the only supporting case that the IRS provides. There, the court found that an action brought by a sub-contractor against the general contractor and the parish for work the sub-contractor had not been paid for was not ripe because the contract explicitly stated that payment of the subcontractor was conditioned on payment of the prime contractor by the parish or the parish by FEMA. *Id.* at *3. Obviously that case is distinguishable from this matter because URG was entitled to payment regardless of whether the parish was ever reimbursed.[64]

SEPH, perhaps predictably, argues that providing documentation was not a requirement of performance whatsoever and its "work" was limited to the physical process of debris removal, which was completed before the end of 2012. Therefore, SEPH does not address when it provided documentation to the parish or the parish's representative.[65]

As is often the case, "there is a position intermediate between that argued by the bank and that advanced by the Government." *Texas Oil & Gas*, 466 F.2d at 1048. While, the Court rejects the suggestion that URG's performance was dependent on

---

[64] St. Bernard, through Jeffrey Bonura, testified: "I think the Parish understood that it had to pay the bill, regardless of FEMA funding. . . . The Parish, had um, a match for this grant; and the Parish is a responsible contracting party; so it understood that it had a bill to pay [to URG]; and it just was, apparently, waiting for it to receive the FEMA funding before it paid." (Rec. Doc. 127-4 at 99).
[65] (Rec. Doc. 106-3 at 15-17).

any approval by FEMA, the Court must acknowledge that the Isaac Contract clearly contemplated URG's obligations to continue past the physical labor of uprooting tree stumps and picking up tree limbs. URG had a contractual responsibility not merely to provide invoices for the work it completed but also to "[a]ssist in preparation of documentation for claims submitted for reimbursement of Contractor's activities under this agreement."[66] This obligation did not persist until FEMA actually gave final approval but it at least continued until the parish received the evidence that it needed to seek reimbursement from FEMA—regardless of when and if FEMA approved reimbursement. Therefore, the Court believes that URG fulfilled its obligations under the Isaac Contract, at the latest, when URG provided documentation—be it an invoice or other evidence—of its debris removal work and the parish or the parish's representative gave its approval of this documentation. This is consistent with the deposition testimony of St. Bernard, on which both parties rely.[67] Thus, accounts receivable under the Isaac Contract were not "acquired" according to the choateness doctrine until URG completely performed its obligation.[68] Although other events could possibly mark an end to performance, the Court believes that parish approval of an invoice is the event that best evidences URG's resolution of its responsibilities. Accordingly, if an invoice was approved before March 16, 2013, then SEPH is entitled to priority as to funds traceable to that invoice. If an invoice was approved after that date, then "[t]he accounts receivable were simply not

---

[66] (Rec. Doc. 110-4 at 47-48).

[67] (*See* Rec. Doc. 114-7 at 14).

[68] The court is unaware of, and the parties have made no mention of, any kind of "substantial performance" exception to the choateness doctrine.

'acquired' at the required point in time, in this case within 45 days of the filing of the tax lien." *Id.* at 1051. This does not at all imply that SEPH's security interest was not sufficiently perfected under state law. *Id.* It appears it was but "it is federal law that determines the extent to which that state determination will protect a private lien from a federal tax lien" and federal tax lien law is unmoved by the fact that "the bank [did] all it could do under the Uniform Commercial Code to secure its interest in taxpayer-debtor's accounts receivable." *Id.*

Copies of URG's invoices have been submitted into the record. While these invoices document when they were sent and sometimes when they were received, there is no indication of when St. Bernard or its representative approved of the documentation as sufficient. Accordingly, the parties' motions shall be denied to the extent they concern funds traceable to URG's performance under the Isaac Contract. The parties may resubmit motions for summary judgment addressing the timing of the parish's approval of invoices.

## CONCLUSION

Accordingly,

**IT IS ORDERED** that the Government's *Motion for Summary Judgment* **(Rec. Doc. 110)** is **DENIED**.

**IT IS FURTHER ORDERED** that SEPH's *Motion for Summary Judgment* **(Rec. Doc. 106)** is **GRANTED in part** as to funds traceable to the Katrina Contracts, excepting invoice [A](801574), but is otherwise **DENIED**.

**IT IS FURTHER ORDERED** that the Government and the IRS shall submit new motions for summary judgment with appropriate summary judgment evidence, briefing the issue of when the parish approved contested Isaac Contract invoices, no later than December 21, 2018.

**IT IS FURTHER ORDERED** that the Clerk's office make delivery of this Order to JKS-URG Management Co, LLC via ECF and by U.S. mail at 8680 Bluebonnet Blvd., Suite D, Baton Rouge, Louisiana 70810.

**IT IS FURTHER ORDERED** that if JKS wishes to make a claim as to invoice [A](801574), JKS shall file a motion to intervene and an accompanying motion for summary judgment as to the corresponding disputed funds no later than December 21, 2018.

11/30/18

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

.