UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SE PROPERTY HOLDINGS, LLC | CIVIL ACTION |
| VERSUS | No.: 14-mc-1739<br>c/w 14-2060 |
| UNIFIED RECOVERY GROUP, LLC, ET AL. | SECTION: "J"(1) |
| | Applies to all cases |

## ORDER & REASONS

Before the Court are *Motions for Summary Judgment* filed by the United States of America (the "IRS") **(Rec. Doc. 145)**, SE Property Holdings, LLC ("SEPH") **(Rec. Doc. 146)**, and JKS-URG Management Co., LLC ("JKS") **(Rec. Doc. 151)**, as well as various responses. Having considered the motions and legal memoranda, the record, and the applicable law, the Court finds that JKS's motion should be **DENIED**, SEPH's motion should be **DENIED**, and the IRS's motion should be **GRANTED IN PART** for the reasons set forth herein.

## FACTS AND PROCEDURAL BACKGROUND

The facts of this case are set forth more fully in the Court's initial opinion. *See SE Prop. Holdings, LLC v. Unified Recovery Grp., LLC*, 357 F. Supp. 3d 537, 541-43 (E.D. La. Nov. 30, 2018). The central dispute here concerns whose interest has priority to funds pertaining to certain accounts receivables that were generated from work performed in the aftermath of Hurricanes Katrina and Isaac.

St. Bernard Parish contracted with Unified Recovery Group, LLC ("URG") to remove debris following Katrina (the "Katrina Contract") and again after Isaac (the "Isaac Contract"). URG completed all of the debris removal by the end of 2012.

On August 29, 2008, URG entered into two sets of transactions. One set, involving SEPH,[1] allowed URG to obtain revolving loans from SEPH and granted SEPH a security interest in, inter alia, "all of [URG's] accounts of any kind . . . whether now existing or hereafter arising."[2] SEPH filed a corresponding financing statement into the UCC registry of Louisiana on August 29, 2008, and has since filed routine continuation statements through August 1, 2018.[3]

The second set of transactions restructured URG to effect a buyout of two of its members and created a new organization, JKS.[4] URG and JKS entered into a "Contribution Agreement" in which URG transferred its interest in "[a]ll accounts receivable of [URG] . . . billed on or before" August 29, 2008, to JKS.[5] JKS acknowledges that no document was ever filed in the public registry or record of any state giving notice of this transfer.[6]

SEPH made its first advance to URG on September 2, 2008. URG did not repay the loans and, in 2013, SEPH obtained a money judgment against URG for more than

---

[1] Technically, URG transacted with Vision Bank, but SEPH is Vision Bank's successor-in-interest due to a 2012 merger. The Court follows the parties' practice of using "SEPH" to refer to both.
[2] (Rec. Doc. 151-9, at 4).
[3] (Rec. Doc. 106-3, at 4-5).
[4] Two related entities bearing the name JKS-URG have attempted to intervene in this case: JKS-URG, LLC and JKS-URG Management Co., LLC. The Court refers to these entities collectively as "JKS" for the sake of simplicity.
[5] (Rec. Doc. 151-6, at 2).
[6] (Rec. Doc. 151-1, at 6).

$20,000,000.[7] Before that judgment issued, the IRS filed a notice of tax lien on January 29, 2013, with the East Baton Rouge Clerk of Court claiming unpaid federal taxes with interest.[8]

St. Bernard Parish filed this interpleader action in 2014 for the Court to determine who had priority to $610,081.45 in FEMA funds distributed to the parish to pay for the debris removal. The IRS intervened, claiming it is entitled to $311,170.45 as of March 31, 2019, plus interest until paid and costs.[9]

In its prior order, the Court determined that SEPH's security interest in the Katrina Contract receivables had priority over the IRS's lien but could not determine priority as to the Issac Contract funds based on the evidence submitted by the parties. *SE Prop. Holdings*, 357 F. Supp. 3d at 551-53. However, because Invoice No. 801574[10] under the Katrina Contract had been billed before URG and JKS entered into the Contribution Agreement, the Court allowed JKS to intervene and argue its entitlement to the funds traceable to that invoice. *Id.* at 550.

Accordingly, the Court granted partial summary judgment in favor of SEPH as to funds traceable to the Katrina contracts, excepting Invoice No. 801574, and ordered SEPH and the IRS to file new motions for summary judgment pertaining to the Isaac Contract invoices. *Id.* at 554. The parties' motions for summary judgment are now before the Court on the briefs and without oral argument.

---

[7] *SE Prop. Holdings, LLC v. Unified Recovery Grp., LLC*, No. 3:12-cv-231-JJB, 2013 WL 1385398 (M.D. La. Apr. 3, 2013).
[8] (Rec. Doc. 145-6, at 63).
[9] (Rec. Doc. 145-1, at 2).
[10] The remaining invoices under the Katrina Contract were billed after the date of the Contribution Agreement. (Rec. Doc. 115-1, at 13-14).

3

# PARTIES' ARGUMENTS

## I. INVOICE NO. 801574

JKS first contends that the provisions of UCC Article 9 (LA. R.S. § 10:9-101 *et seq.*, hereinafter "Chapter 9") do not apply to Invoice No. 801574 because JKS acquired the account either "as part of a sale of the business out of which [the account] arose" or as "an assignment of accounts . . . for the purpose of collection only," invoking the exceptions under Louisiana Revised Statute § 10:9-109(d)(4)–(5). Next, JKS asserts that if Chapter 9 applies, SEPH, as successor in interest to Vision Bank, is estopped from asserting an interest in the account because Vision Bank recognized that it did not have an interest in the JKS receivables. JKS maintains that URG lacked authority to incur the $10,000,000 of indebtedness from the promissory note prior to executing the Contribution Agreement because doing so would have been outside the ordinary course of business and there is no evidence that a majority of URG's members voted to do so. Finally, JKS argues it was not a "buyer" within the meaning of Chapter 9 for purposes of the Contribution Agreement.

SEPH opposes JKS's motion, arguing first that the exceptions JKS asserts do not apply because those provisions only pertain to situations "that, 'by their nature, do not concern commercial financing transactions.'"[11] SEPH avers that JKS has failed to demonstrate that equitable estoppel applies, as JKS cites no authority for this argument, and further contends that the language of the Security Agreement is unambiguous, such that looking to extrinsic evidence of Vision Bank's knowledge

---

[11] (Rec. Doc. 157, at 4) (quoting LA. R.S. § 10:9-109, UCC cmt. 12).

violates the parol evidence rule and Louisiana principles of contract interpretation. Finally, SEPH notes that JKS's argument that it was not a "buyer" is inconsistent with its position that the transaction was a sale of accounts and again misinterprets the scope of Chapter 9.

The IRS does not oppose JKS's motion.[12] In its reply, JKS focuses only on its argument that Chapter 9 does not apply because the transaction was a sale of accounts as part of a sale of the business out of which the accounts arose.

## II.  THE ISAAC CONTRACT

SEPH first argues, contrary to the Court's prior order,[13] that documentation was not required as part of URG's performance under the Isaac Contract because St. Bernard Parish retained its own representative, Witt O'Brien ("WO"), to document URG's debris removal activities, as evidenced in a newly-submitted declaration by one of the parish's representatives.[14] But assuming that a documentation requirement existed, SEPH contends that URG fulfilled the requirement on the day it surrendered its invoices and the documentation prepared by WO to the parish for payment, which means that SEPH has priority for six of the seven Isaac Contract invoices, totaling $226,724.03. Finally, SEPH disputes that approval of URG's documentation by St. Bernard was required for URG to complete performance, but maintains that if it was, SEPH has priority as to the IRS's second notice of tax lien.

---

[12] (Rec. Doc. 156).
[13] "[T]he Court finds that in order to achieve performance under the Isaac Contract, URG was required to provide documentation." (Rec. Doc. 135, at 22).
[14] (Rec. Doc. 146-27).

The IRS contends that URG's performance was not completed until January 20, 2016, the date on which the payment recommendations for the URG invoices were submitted to St. Bernard Parish by Barowka & Bonura Engineers & Consultants, LLC ("BBEC"), a consultant retained by the parish to help "resolve certain problems that were preventing it from obtaining FEMA reimbursements for the URG Invoices."[15] Although the parish had first approved the URG invoices on March 3, 2014, and submitted its reimbursement request based on those invoices to FEMA on March 17, 2014, the IRS asserts that this approval was ineffective because the parish later revoked it after learning that the payment recommendations for these invoices were "materially deficient" and retained BBEC in February 2015 to resolve the problems preventing the parish from obtaining reimbursements from FEMA.[16] Thus, because approval came after March 16, 2013 (the 46th day after the IRS filed its notice of tax lien), the IRS's interest takes priority over SEPH's.

## **LEGAL STANDARD**

Summary judgment is appropriate when "'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."

---

[15] (Rec. Doc. 154-1, at 11-12).
[16] *Id.* at 19.

*Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one for which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one for which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue at trial. *See id.* at 325; *Little*, 37 F.3d at 1075.

When examining matters of state law, the Court will employ the principles of interpretation used by the state's highest court. *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 564 (5th Cir. 2010). Mindful of Louisiana's distinction between primary and secondary sources of law, the Court will begin its analysis with reliance on the Louisiana Constitution and statutes before looking to "'jurisprudence, doctrine, conventional usages, and equity, [which] may guide the court in reaching a decision in the absence of legislation and custom.'" *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 546 (5th Cir. 2004) (quoting LA. CIV. CODE art. 1 rev. cmt. b). If the Court must make an "Erie guess" on an issue of Louisiana law, the Court will decide the issue the way that it believes the Supreme Court of Louisiana would decide it. *Id.* The Court is not strictly bound by the decisions of the state intermediate courts and will disregard them if the Court is "convinced that the Louisiana Supreme Court would decide otherwise." *In re Katrina Canal Breaches Litig.*, 496 F.3d 191, 206 (5th Cir. 2007).

## **DISCUSSION**

Following the Court's prior grant of summary judgment, two issues remain: (1) whether SEPH or JKS is entitled to the funds traceable to Invoice No. 801574; and (2) whether URG completed performance under the Isaac Contract before the 45-day state-lien grace period for the IRS's tax lien expired on March 16, 2013.

### I. INVOICE NO. 801574

The Court must first consider JKS's argument that Chapter 9 does not apply to the Contribution Agreement. If the Court finds that it does, then the Court must

8

consider JKS's remaining arguments that SEPH is precluded from asserting its interest in the Invoice No. 801574 funds.

## A.  Whether Chapter 9 Applies

Generally, Chapter 9 applies to "a sale of accounts." L<small>A</small>. R.S. § 10:9-109(a)(3). However, it does not apply to either "a sale of accounts . . . as part of a sale of the business out of which they arose" or "an assignment of accounts . . . for the purpose of collection only." § 10:9-109(d)(4)–(5). The purpose of these provisions is to "exclude . . . certain sales and assignments of receivables that, by their nature, do not concern commercial financing transactions." § 10:9-109, UCC cmt. 12. The Court concludes that neither exception applies in the instant case.

First, the Court finds that the Contribution Agreement was not a "sale of the business" under § 10:9-109(d)(4). The Contribution Agreement states that it was made between URG and JKS.[17] Its purpose was to "transfer and convey to [JKS] all of [URG's] right, title and interest in and to certain assets" and for JKS to "assume certain liabilities" from URG.[18] It goes on to define the assets to be conveyed to JKS, the liabilities JKS would assume, and the assets and liabilities to be retained by URG, which included "[a]ll obligations and liabilities arising solely out of the operation by [URG] of its business from and after the Effective Date."[19] Further, the language of the Purchase and Sale Agreement describes the Contribution Agreement as a distinct transaction: "[I]mmediately prior to the closing of the transactions contemplated by

---

[17] (Rec. Doc. 151-6, at 1).
[18] *Id.*
[19] *Id.* at 1-3.

9

this Agreement, certain assets and liabilities of [URG] will be assigned, transferred, and conveyed by [URG] to [JKS]."[20] Clearly, then, while the Contribution Agreement could be considered a sale of accounts, it was not "a sale of the business out of which [the accounts] arose." § 10:9-109(d)(4).

Quite tellingly, JKS acknowledges in its reply brief "that something less than URG's entire business was sold."[21] Its assertion that the exception applies when "the account arises 'as part of a sale'"[22] is almost entirely divorced from the language of the statute, which requires that the accounts be sold "as part of a *sale of the business* out of which they arose." *Id.* (emphasis added). While the accounts arose out of the operation of URG, the Contribution Agreement did not effect a sale of URG. Thus, the exception in § 10:9-109(d)(4) does not apply. *Cf. In re Biloxi Prestress Concrete, Inc.*, 98 F.3d 204, 208 (5th Cir. 1996) (construing UCC Article 9 exception narrowly to exempt only "the singular transaction" that met the statutory criteria).

The Court also finds that the Contribution Agreement was not "for the purpose of collection only." § 10:9-109(d)(5). "This exception generally applies when accounts are assigned to a collection agency for collection." *Texas Dev. Co. v. Exxon Mobil Corp.*, 119 S.W.3d 875, 883 (Tex. App. 2003) (interpreting Texas version of Chapter 9). An assignment is "for collection only" where it allows an assignee to "br[ing] suit to collect money owed to [its] assignors" and the assignee "promised to turn over to those

---

[20] (Rec. Doc. 151-11, at 1). The Purchase and Sale Agreement labels the transactions underlying the Contribution Agreement "the 'Spin-Off.'" *Id.* A spin-off is "[a] corporate divestiture in which a division of a corporation becomes an independent company and stock of the new company is distributed to the corporation's shareholders." *Spin-off*, BLACK'S LAW DICTIONARY (11th ed. 2019).
[21] (Rec. Doc. 163, at 4).
[22] *Id.* (quoting § 10:9-109(d)(4)).

assignors the proceeds secured through litigation." *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 280 (2008). This is plainly not the case here, as the Contribution Agreement assigned to JKS "all of [URG's] right, title and interest in and to the Contributed Assets."[23]

The present situation can be distinguished from *In re Biloxi Prestress Concrete, Inc.*, where the Fifth Circuit held this exception under Mississippi's version of the UCC applied to an assignment of accounts receivable from an unsecured creditor to a secured creditor of the same debtor. 98 F.3d at 208. In that case, title to the accounts had not passed to the secured creditor, the unsecured creditor continued to claim the accounts as its property, and the assignment was not made for payment or to secure another transaction between the creditors—rather, the secured creditor admitted it was acting as the collection agent for the unsecured creditor. *Id.* at 206. Here, by contrast, the Contribution Agreement purported to vest all title in the account to JKS and effected a restructuring of URG.

The Court finds additional support for its conclusion that Chapter 9 governs here in the UCC's mandate that it "shall be liberally construed and applied." LA. R.S. § 10:1-103(a); *see Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498, 506 (5th Cir. 2014). Therefore, the Court holds that Chapter 9 applies to the Contribution Agreement.

## B. JKS's Remaining Arguments

---

[23] (Rec. Doc. 151-6, at 1).

11

JKS next argues that SEPH is estopped from asserting its interest in the Invoice No. 801574 funds because Vision Bank, SEPH's predecessor in interest, had actual knowledge of the transfer of the account to JKS. In opposition, SEPH maintains that JKS fails to cite any authority supporting its estoppel argument and that none of the elements of estoppel are met here. The Court finds that JKS has failed to carry its burden of showing that equitable estoppel applies. *See Luther v. IOM Co.*, 2013-0353, p. 11 (La. 10/15/13); 130 So. 3d 817, 825 ("Estoppels are not favored in [Louisiana] law; therefore, a party cannot avail himself of that doctrine if he fails to prove all essential elements of the plea."). Moreover, JKS's argument is contrary to Louisiana law: "'The Louisiana rule is that actual knowledge by third parties of an unrecorded interest is immaterial; proper filing alone is dispositive.'" *First Nat'l Bank of Picayune v. Pearl River Fabricators, Inc.*, 2006-2195, p. 22 (La. 11/16/07); 971 So. 2d 302, 316 (quoting LA. R.S. § 10:9-317 cmt. a.).

Finally, as to JKS's contention that it was not a "buyer" for purposes of § 10-9:318, the Court flatly disagrees. Title 10 defines "purchase"[24] broadly to include "taking by sale . . . or any other voluntary transaction creating an interest in property." LA. R.S. § 10:1-201(b)(29). A "purchaser," naturally, is one who "takes by purchase." § 10:1-201(b)(30). And "a person gives value for rights if the person acquires them . . . in return for any consideration sufficient to support a simple contract." LA. R.S. § 10:1-204(4).

---

[24] "Purchase" is the more formal version of "buy," but otherwise the words are synonyms. BRYAN A. GARNER, THE OXFORD DICTIONARY OF AMERICAN USAGE AND STYLE 51 (2000).

The Contribution Agreement gave JKS a property interest in the Contributed Assets "[f]or and in consideration for the assumption of certain liabilities by" JKS.[25] Plainly, JKS should be considered a buyer under this agreement.

In sum, this situation is exactly one that the priority rules were developed to address, and JKS cannot now escape the reach of Chapter 9. "The policy, which has prevailed in Louisiana, is to deny the benefits of security to a creditor who does not take the steps the law declares are necessary to give publicity to his interest." *Tetra Applied Techs., Inc. v. H.O.E., Inc.*, 2003-1523, p. 9 (La. App. 3 Cir. 5/26/04); 878 So. 2d 708, 714. Because JKS failed to perfect its interest in the URG receivables, URG "is deemed to have rights and title to the account . . . identical to those [it] sold" at the time it entered the Security Agreement with SEPH, and SEPH's security interest, perfected on September 2, 2008, takes priority over JKS's unperfected interest. § 10-9:318(b) & UCC cmt. 3. The Court concludes that judgment should be entered in favor of SEPH as to Invoice No. 801574.

## II. THE ISAAC CONTRACT

The Court will first address when URG completed performance under the Isaac Contract. If URG completed performance before March 16, 2013, then its right to payment became "choate" at that time such that SEPH's security interest has priority over the IRS's tax liens. *SE Prop. Holdings*, 357 F. Supp. 3d at 553. The Court will then consider the IRS's new argument regarding the amount of funds traceable to the Isaac Contract.

---

[25] (Rec. Doc. 151-6, at 1).

## A. When URG Completed Performance

In its prior order, the Court held:

> URG had a contractual responsibility not merely to provide invoices for the work it completed but also to "[a]ssist in preparation of documentation for claims submitted for reimbursement of [URG's] activities under this agreement." This obligation did not persist until FEMA actually gave final approval but it at least continued until the parish received the evidence that it needed to seek reimbursement from FEMA—regardless of when and if FEMA approved reimbursement. Therefore, the Court believes that URG fulfilled its obligations under the Isaac Contract, at the latest, when URG provided documentation—be it an invoice or other evidence—of its debris removal work and the parish or the parish's representative gave its approval of this documentation. . . . Although other events could possibly mark an end to performance, the Court believes that parish approval of an invoice is the event that best evidences URG's resolution of its responsibilities. Accordingly, if an invoice was approved before March 16, 2013, then SEPH is entitled to priority as to funds traceable to that invoice.[26]

The Court then directed the parties to submit new motions for summary judgment "briefing the issue of when the parish approved contested Isaac Contract invoices."[27]

SEPH's first argument, that URG was not required to provide documentation to the parish because the parish had retained its own representative to do so, is easily refuted by the language of the contract:

> Documentation and Inspections: All debris removal operations and all debris shall be subject to inspection and monitoring by the [parish]. [The parish] may engage a third party to undertake monitoring and inspection for [the parish]. . . . [URG] and the [parish] shall have in place at the DMS *each's own personnel to verify and maintain records* regarding the contents and cubic yards of the vehicles entering and leaving the DMS(s).[28]

---

[26] (Rec. Doc. 135, at 24) (first alteration in original) (footnote omitted).
[27] *Id.* at 26.
[28] (Rec. Doc. 145-9, at 6) (emphasis added).

Thus, the parish retaining WO to monitor debris removal and maintain records did not relieve URG of its own responsibility to do so.

SEPH next contends that URG completed performance when it provided its records to the parish and WO because WO was responsible for approving URG's invoices. Therefore, SEPH claims it has priority to six of the seven Isaac Contract invoices, based on the date of those invoices.

Not only does SEPH fail to offer any evidence of when these invoices were actually provided to the parish or its representative, as the IRS points out, but this argument also fails to address the approval requirement as explained in the Court's earlier opinion. While the Court's opinion leaves open the possibility that a different event could indicate URG's completion of performance, SEPH fails to identify any language in the Isaac Contract supporting its proffered interpretation.

The evidence reflects that WO transmitted to the parish its payment recommendation for six of the seven invoices on March 18, 2013, and its payment recommendation for the final invoice on April 24, 2013.[29] The Department of Public Works then approved all of these invoices on March 3, 2014.[30] While the IRS contends that this approval date should not be considered the date URG completed performance because these approvals were later revoked, the Court need not consider this argument because in either case the approval date comes after the effective date of the IRS's tax liens. Accordingly, the Court holds that the IRS's tax liens have

---

[29] (Rec. Doc. 145-10, at 2).
[30] *Id.*

15

priority over SEPH's interest in the URG receivables under the Isaac Contract, which came into existence, at the earliest, on March 3, 2014.

**B.   Funds Traceable to the Isaac Contract**

To date, four deposits have been made to the Court's registry in this matter: (1) $227,075.00, traceable to Invoice No. 801574 under the Katrina Contract;[31] (2) $279,205.21, traceable to the Isaac Contract invoices;[32] (3) $36,204.09, traceable to two invoices under the Katrina Contract;[33] and (4) $67,597.15, traceable to four invoices under the Katrina Contract.[34] In total, $330,876.24 is traceable to the Katrina Contract and $279,205.21 is traceable to the Isaac Contract.

However, in a clever attempt to circumvent the Court's ruling that SEPH has priority over the IRS as to funds traceable to the Katrina Contract, the IRS now asserts that $366,547 of the interpleaded funds should be attributed to the Isaac Contract. The IRS reasons that because St. Bernard Parish used some of the funds it received in reimbursement from FEMA for the Isaac Contract to pay subcontractors of URG for work performed pursuant to the Katrina Contract, those amounts, totaling $87,342, should be deducted from the funds in the Court's registry attributable to the Katrina Contract and instead be attributed to the Isaac Contract.

"An obligor who owes several debts to an obligee has the right to impute payment to the debt he intends to pay." LA. CIV. CODE art. 1864. The evidence clearly shows that the parish intended to pay debts related to the Isaac Contract invoice with

---

[31] (Rec. Doc. 21; Rec. Doc. 115-1, at 13).
[32] (Rec. Doc. 74; Rec. Doc. 115-1, at 14).
[33] (Rec. Doc. 111; Rec. Doc. 115-1, at 14).
[34] (Rec. Doc. 111; Rec. Doc. 115-1, at 14).

the deposit of $279,205.21 to the Court.[35] However, the IRS has not presented any evidence to show that the parish intended to satisfy any Isaac Contract debts with any of the other deposits; to the contrary, its prior response to SEPH's statement of uncontested facts clearly shows that it believed the remaining funds were traceable to the Katrina Contract.[36] To the extent that the IRS now attempts to assert otherwise, the Court finds that it is judicially estopped from doing so. *See In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999) ("[A] party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position.").

## CONCLUSION

In conclusion, the Court holds that (1) SEPH is entitled to the funds traceable to Invoice No. 801574, and (2) the IRS's tax liens have priority over SEPH's security interest in the Isaac Contract receivables. Accordingly,

**IT IS HEREBY ORDERED** that JKS's *Motion for Summary Judgment* **(Rec. Doc. 151)** is **DENIED** and SEPH is **AWARDED** $227,075.00, the funds traceable to Invoice No. 801574 under the Katrina Contract.

**IT IS FURTHER ORDERED** that SEPH's *Motion for Summary Judgment* **(Rec. Doc. 146)** is **DENIED** and the IRS's *Motion for Summary Judgment* **(Rec. Doc. 145)** is **GRANTED IN PART**. The IRS is **AWARDED** $279,205.21, the funds traceable to the Isaac Contract. The IRS's motion is **DENIED** to the extent it seeks a greater award.

---

[35] (Rec. Doc. 152-30, at 1).
[36] (Rec. Doc. 115-1, at 13-14).

17

**IT IS FURTHER ORDERED** that SEPH is **AWARDED** $103,801.24, the remaining funds traceable to the Katrina Contract.

New Orleans, Louisiana this 30th day of September, 2019.

                                                    _____
                                                    CARL J. BARBIER
                                                    UNITED STATES DISTRICT JUDGE